All right, our second case for this morning is Caudill v. Keller Williams Realty. And when you're ready, Mr. Silverman, we'll let people clear out of the courtroom. You may come up. Good morning. Now I think we're safe. Excuse me. Good morning. My name is Peter Silverman. I represent the appellants in the case. You speak louder, please. Yes, Your Honor. My name is Peter Silverman. I represent the appellants, Ms. Caudill and Leaders, LLC, which is a business that she owns with her husband. The issue in the case, we believe, is very narrow. It involves the enforceability of a liquidated damages provision contained in a settlement agreement. The district court abrogated this provision, and we respectfully believe that it was contrary to the facts, to Texas law, which the parties agree apply and the district court agreed, and to some very important public policies. So it seems to me your big report was that the claims for professional opportunities, future income, embarrassment, reputation were too speculative and remote to constitute actual damages and that there was no evidence of any tangible harm that was suffered by the plaintiffs. So what evidence in the record indicates that that holding was wrong? Was there any financial evidence produced in discovery that demonstrated a loss? Your Honor, in terms of the district court's opinion, the judge did find that the liquidated damages provision, at least in part, was enforceable, in that the damages were difficult to measure at the time of contracting, if not impossible to calculate. But let me intervene here. Maybe this can inform also your answer to Judge Rovner's question. It seems to me your biggest problem lies in Texas law. It pains me to say so, being from Texas, but I think that that is the issue, because many jurisdictions will simply look at a liquidated damages clause at the time it's entered into and assess it from that light. But Texas appears to take a second look at the back end to see if it remains a reasonable measure of damages in light of what the actual damages were. And Texas doesn't seem to like it when the gap gets too big. And I think that's what the district court judge was looking at. That's why he was taking a second look at the factors that Judge Rovner is talking about. And if that's what Texas law is, then whether we like it or not, that's the law we follow. Judge, we have no problem following that law, and we think that under the law, that the liquidated damages provision is enforceable. And the court is correct that... Twenty million dollars for this? Well, Judge, we've never asked for $20 million, never. And what the court said is, well, I gleaned that because there were 2,000 disclosures, and it's $10,000 per disclosure. You're seeking $20 million. We did not. What we were anticipating was we move for partial summary judgment as to liability, and then we felt that if we prevailed, we then would move as to the issue of how many occurrences there were, which really is the issue. Right, but so do you think there was maybe one occurrence? No, Judge. That would just be $10,000, and we probably wouldn't be here. We would not be here then. And that's really what this boils down to is this issue of occurrences, in our opinion. If you look at the Helix case, it's almost the same as our case. You have a settlement agreement. You have a confidentiality provision. You have a breach. It was provided to two people, and they submitted affidavits saying, we have nothing to do with this doctor's recredentialing. We're uninvolved. We destroyed this. We never talked to anybody about it. It had no impact on us. The doctor, who was the plaintiff, said, I don't know how this affected me. And nevertheless, under those circumstances, the Texas Appellate Court enforced this provision. We have, in this case, our facts are better, in the sense that Keller Williams never talked to any of the 2,000 people that received this disclosure, as far as we know. Maybe they did talk to them and got bad information. But in the record, in terms of their burden, which is the key, it is their burden to show that the actual damages and the liquidated damages, that there is this enormous gap. We don't understand, first of all, how the court could find that there were no actual damages and that Keller Williams met its burden. Well, the court, I'm looking at page 22 of the court's opinion, goes through this. I gather Keller Williams asked her for the names of lost referrals, for who was sending her business in the past. How did this fall apart after these disclosures? And he goes through a number of things and acknowledges as well the difficulty of proving a negative. I mean, it's very hard for one side to do that. But he does find that there's more than just an absence of evidence. I think he tries to put the burden on Keller Williams. Judge, I believe that the court, respectfully, made various statements in his ruling that are a little bit confusing because he does say that the burden is on Keller Williams. Right. But then he goes on to say, well, look at what Keller Williams did. They asked the plaintiff, what are your damages? And she said, I can't calculate them. How is Keller Williams supposed to, how is any company supposed to meet that burden under Texas law to show that the opponent actually was not injured? Or perhaps, you know, maybe actual damages are nominal or something of the sort. Well, it depends on the case. The law is that you have uncertainty. Everybody agrees on that. It's reputational damage, lost opportunities. And the burden to demonstrate that is shifted. It's allocated to Keller Williams. It's not allocated to us. We did not have to prove anything. And the judge acknowledges that. But, Judge, I believe that what he does is he then, while he acknowledges it, goes on to say, okay, look at the plaintiff's testimony. Just like in the Helix case. She does not know how exactly she was harmed. She does not know. You know, I have a problem, and maybe you can help me with it. Because the brief argues that the court's error in applying law that was relevant to a pre-breach clause when this case involves a post-breach clause. But if we were to hold there was such a distinction in the law, why would this case be considered a post-breach situation? The breach here, it seems to me, involving the disclosure, was unknown at the time the clause was agreed upon and occurred after that agreement. So the nature of the breach was unknown at the time. Doesn't that make it a pre-breach provision as opposed to a situation, for instance, in Bolton where the breach had already occurred and the liquidated damages applied were based on the timing of the damages payment? So that's where we're in a quandary. Judge, I didn't quite finish my answer about the damages, if I could go back to that. But, Your Honor, to answer your question, there is law, and it is derived from the Williston Treatise, has been applied by some courts, that where there's a settlement agreement, a contract of a court, that it should be treated differently because at the time the parties are together and they're trying to figure out a resolution of an underlying dispute. And the concerns that courts may have about, well, you're setting up a provision up front that refers to damages and that there has to be some activism, it doesn't apply. Where you have here a party that is self-described as the largest real estate company in North America with 90,000 agents, multiple lawyers, teams of lawyers working on this, and they agree to this provision. But here's what I think Judge Rovner is saying. The underlying contract, Alana, let me just do this. The underlying contract was the subject of the settlement agreement, so contract number one. The settlement agreement itself is an agreement, so it's contract number two. And one of the provisions of the settlement agreement was the confidentiality clause in the settlement agreement. And so what's breached isn't anything about contract number one. It's a provision of the settlement agreement itself that gets breached, and I think that's what Judge Rovner is focusing on. And that's a fair point, Judge, and I understand. One of the things that Judge Koukouras did is he looked at the settlement and he looked at how much the settlement was, and he was comparing that to liquidated damages. Again, $20 million, which we had never said what we intended to do was to offer various damages scenarios, which can be done, where you can say, well, there were multiple disclosures to this one franchisee. You should count that as one. And we were hoping to have a range of occurrences to allow the court to select one. We did not get to that point. But in terms of the issue about the application of Williston, our point really is that the judge, in ruling to a degree, did apply this comparison of the underlying case and the settlement to the liquidated damages, which is similar to what's done in Williston, where you look at the underlying case, but you look at the claims, which we contend are very, very valuable claims that were settled for $1 million in large part because our client wanted it over and did not want this further disclosed, and that's inherent in the agreement. And the bargain was, here's the money, no more talking about this, so I can go forward with this business, which is based on referrals. So let me ask you this question, though. Looking at the district judge's opinion, at the bottom of page 5, carrying over to more than half of page 6, is the language of the disclosure document that you're concerned about. All of that seemed to me to be matters of public record, except for perhaps the last sentence, I guess just with respect to the last sentence. So that's what we have to focus on, isn't it, in terms of assessing actual damages? No. Everything else is public. No, Your Honor, it is public and just public. There was information submitted to the FTC, and it might be available if somebody went to look for it, as opposed to sending this disclosure directly to these people. But there you run into the fact that they're required, under all these franchise protection statutes, to disclose things like this. Your Honor. Maybe not the last sentence. Yes. I don't think they were required to say anything about the amount of money, but most of this they have to disclose. There's a real issue about the disclosure. They just say, well, we have to disclose it. They never demonstrated with these 2,000 people that they should have disclosed this information to them. One, they never did it. But also, very importantly, and the district court agreed that this was important, is under the settlement agreement, to the extent that there's disclosure, there's an obligation to the party that's disclosing it to have the recipient sign off on the confidentiality. It's paragraph 12 of the agreement. They did not do that, and Judge Kocouras found that that was a breach. Notably, in this disclosure, it says right on it, we encourage you to take this disclosure and show it to other people, to show it to lawyers, to show it to accountants. It's right in this disclosure. There's absolutely nothing in the record to suggest that these 2,000 people knew any of this information. And the confidentiality does not apply simply to the settlement terms. It applies to the allegations in the case, and it's very important. But I guess I'm just having a lot of trouble thinking of something that relates to a case that's filed. All case filings are presumptively public. Case number 1-11-CV-01140, of course that's public, especially today. It was under seal, Your Honor. Today? The case was under seal, and it was lifted in connection with this appeal. But this information was not public through the lawsuit. It was public through the FTC to the extent that there's a requirement, and we agree that that's in compliance with the contract. The regulators have it potentially out there, and you can access it. But the point is what was contracted for here was you have a business, a real estate business. It's so heavily dependent upon referrals. That's how our client became the number one salesperson there. She has this network of people, and it's growing and growing. And she doesn't want this particular disclosure going right directly targeted to this person who could be a referral source as opposed to that person going and looking potentially and finding this information. That's what was contracted for. That's what they agreed to, and that's what they breached. So I have a completely probably non-pertinent question, but why does it hurt her for the other franchisees to know that she won a considerable settlement from Keller Williams? I could envision it hurting her. You could have a situation where you have a realtor having lunch with someone saying, oh, did you hear, Jan, I got a million dollars from our franchisor, and not liking it and not wanting to upset the franchisor, thinking that she had made all this money. There's so many reasons. And the issue is, Judge, that it is not possible to measure this damage. It also, in our opinion, is not reasonable to say that there were no damages. There's a definite difference between being unable to measure the damages and there not being damages. And we believe at the end of the day what harmed us is the arrogant behavior of Keller Williams where they just said, we don't care. You said that you weren't seeking $20 million. No, Your Honor, no. So what are you seeking? We're not of record seeking anything. You don't want anything? No, we'd like something. How would that be calculated? Well, Your Honor, the $10,000 we believe per occurrence is fair and reasonable. And if the court agrees, then it's a matter of how many occurrences and what we had intended to do if we went on liability was to present alternative models. Well, how many occurrences? Well, wait a minute. You're saying 2,000 individuals? Just a minute, Your Honor. I think Dick is still asking. Oh, sorry. How many occurrences were you thinking there were? Well, there was 2,000 disclosures, Your Honor, but we have not claimed each one of those as breaches. But what principled definition of, I think that's the question, what are you defining an occurrence as? Your opponents say maybe it's 200 million if it's 2,000 disclosures per year times 10 years, which did seem quite extreme to me today. Your Honor, what it depends on is what we're claiming. So what we would do is, we were hoping to do, is to say, okay, there's different ways you could look at this. So give us some of them. Well, some of them are, as an example, you have, say, five, maybe 10 disclosures to various people who are part of a franchisee, each one of them getting a disclosure. Perhaps that should count as one. That would be one model. So one disclosure to Coldwell Banker and one disclosure to somebody else. And we would try to have that be one. That would bring the number down substantially. We'd have another one where we say, well, in this instance, and they've admitted to this, you just sent this out for informational purposes. You have no basis to say that it was required. So we could put together the different disclosures that clearly were not required. And so the issue is, and the concern we have is, how do they benefit from multiple breaches? That's the problem we have is they breached it too much. And there's something unfair about that. And we're conscious of it. $200 million is not reasonable. We would not ask for $200 million. But, frankly, $20 million where you have a woman making $3 million a year, and her career is greatly affected by this. And the last thing I'll say, I know my light's on, is there is the plaintiff's testimony, which the court disregarded, where you have some financial information that's provided by Keller Williams about these gross revenues, but the profitability of the business went down. And there is testimony in the record from the plaintiff based on her experience, her background. It's credible testimony, and it does, and the court disregarded it. And we don't think that that was legitimate. I'll reserve the rest of my time. All right. Thank you. That's fine. Ms. Morrency? Good morning, Your Honor. I would urge the court to keep two points in mind in deciding this case. First, the reason that the district court concluded that plaintiff's demand was for $20 million was because he ran the math provided to him by the plaintiffs, and also that the plaintiffs provided to this court. The plaintiffs have taken the position at page 18 of their reply brief, as they did below, Keller Williams contractually allowed disclosure to governmental authorities, did not excuse its 2,000 contractually precluded confidentiality breaches. That was the number in their header and in their argument. That is the same position that the plaintiffs took below before Judge Koukouras. On the cross motions for summary judgment, their claim was $20 million, and that appears, for example, at docket 95, page 18, where they again say there were 2,000 breaches because Keller Williams made this disclosure not just to the regulators but to the franchisees whom the regulators protect. So if they're only asking for $20 million, it did seem to me quite a stretch for you to take the position in your brief that it was $200 million. I mean, we don't have to make them completely unreasonable, and it does also seem to me that if Texas law allows this look back, you know, at the time that the liquidated damages are sought, I think that's the essence of this problem. I don't think anybody thinks that this was all that easy to figure out. I think initially $10,000 was a fairly decent estimate of what damages could be. That's what you look for in liquidated damages. But when you have this look back, then two things become critically important. One is how good does the evidence that Keller Williams presents of lack of actual damages have to be? And I think there's some problems with your evidence. And the other problem is what is the request? Because if the delta, if the difference between the request, you know, was $1 million versus $10,000, maybe that would be one thing, $100,000.  And as you play with it, the look back becomes more and more deferential to the clause. Yes, Your Honor. And for that reason, I would like to focus on Judge Rovner's question about what were the actual damages here. Judge Koukouras properly placed the burden on Keller Williams, and he commented in his opinion that Keller Williams bore that burden. Keller Williams had to move to compel twice for financial documents, including the tax returns. And in the information it discovered, it concluded that there had been no harm to the plaintiff. So the court unpacked that in two ways. First, to your question, what was the logical harm of someone knowing that Ms. Caudill and her franchise had earned $1 million through this settlement? And the amount was required under the CFR rules and the FTC rule, because it's a material term of a settlement between a franchisee and a franchisor, and all the footnotes explain that the amounts are included in that. But in examining what was the logical harm, the court said the court can discern no logical harm that would befall the plaintiff from someone knowing that she had achieved a settlement of over $1 million in a settlement. For that reason, causation was a serious problem for the plaintiffs below, because all of the damage that they were asserting came from their termination as a Keller Williams franchisee after their default. Settlements are usually confidential. Frequently they are, Your Honor. Why do you think usually is more accurate than frequently? In the franchise world, the FTC and the 14 registration states required that the material terms of a settlement between a franchisor and a franchisee be disclosed. And that is why, in this case, we understand that the exception was written for disclosure to regulators and governmental authorities as required by law. At that point, the information became public under the applicable statutes and the Sunshine Laws. Some of the regulators, including Minnesota and California, posted the FDDs online. It's available from the Minnesota Department of Commerce. I checked yesterday to make sure the link was working. And so this public information, the regulators deem important for a franchisee, a prospective franchisee, to understand what the relationship is between a franchisor and its other franchisees. It's based on the Blue Sky Laws, and it's material to their decision whether to invest in a franchise. So why did the split between the insurance company and Keller Williams have to be there? Because the description had to be of the amount the franchisor paid under the regulations. So that's why they had to specify what came from whom. Why isn't it sufficient to survive summary judgment for her to testify to the financial laws based on her experience? And, Your Honor, the court permitted her to testify that, but it's not sufficient under the decisions of this court in cases like Echo and Zenith. And where it's untethered to reality and contradicted by the documents, that type of aspirational damage claim is appropriately disregarded, and that is exactly what happened here, if I can point it out to the court. Because in addition to the lack of the logical harm, there was lack of actual harm. The claim of injury, for example, we take lost revenues. Ms. Caudill testified that she had expected in the year of the disclosure, 2013, gross revenues of more than $2 million, but she only earned half a million. She surmised that she lost the difference, $1.5 million. But the actual unrebutted sales figures established that she and her company received 2013 gross revenues, the year of the disclosures, not of $500,000, but of $2.7 million. That was $2 million more than she expected. That chart is at page 17 of our brief. Why didn't the settlement determine how much damage his plaintiff was entitled to? The settlement agreement itself, Your Honor, came in a setting where Keller Williams and its executives vehemently denied that there had been any damage or any justification for the underlying claims. The settlement is the settlement that resolves her termination as a Keller Williams representative of some type. She had that administrative role, as I recall. She did. That's what that's settling. Then in the course of those discussions, there's a question, is it going to be $50,000, $10,000, some number? They come up with a number. I don't think we look into parole evidence about that. It's in there, and it's $10,000. So the real question is why, in the face of all of this vagueness, why don't we just enforce the liquidated damages provision? That's what they're for. There's certainly some loss, and she makes the point, which I think has some force, that you can look at what she did earn, but she thinks she would have earned more. Texas examined that in detail in the 2014 opinion in the FPL case. In that case, the court said, we take this look back and compare the damages sought, which in this case were $20 million for 2,000 breaches, and we compare them to the actual damages suffered. Where there is an unbridgeable chasm, where there's a discrepancy, we invalidate the liquidated damage clause, and the plaintiff then pursues actual damages. In the FPL case, the actual damages were $6.1 million, and the liquidated damages would have been nearly $30 million. So the court returned the parties to the question of actual damages. What's the purpose of having a liquidated damages clause if the court has to determine the actual damages? Well, the burden is on the challenger to such a clause to investigate the actual damages and demonstrate the unreasonableness, which is what we presented the court with here. But this complaining party would have agreed to the liquidated damages, right? You have to agree to a liquidated damages clause in a contract, right? Correct. Now, why isn't that agreement treated as final? Unless there's fraud or something. Your Honor, Texas explains it as its adherence to the principle of just compensation. It does not countenance punitive or penalty clauses in a contract setting. Why? It is a time-honored principle in Texas. Well, does it have any sense to it, or it's just some stale rule from the 14th century? I don't think Texas has explained it. I mean, usually people are allowed to agree, especially, you know, these are business people. They're allowed to agree on what damages will be if there's a breach. You'd think it would require exceptional circumstances, fraud or something, to say, well, you agreed to pay this, but we're letting you renege. Texas looks at what unintended consequences might be. And in the FPL case, they looked at what looked like a reasonable charge of $50 per renewable energy bill. It was caught in a dispute between business people. But it was a very sophisticated dispute in FPL. Well, if it was sophisticated, let them resolve it themselves rather than injecting the court. If only that were possible, Your Honor. Of course it's possible. But whereas here a party seeks $20 million and has suffered no discernible actual harm from the regulators and franchisees knowing that she recovered more than $1 million, there's an injustice that Texas law guards against. And that is what it does. What evidence demonstrated that the amount was not a reasonable forecast of just compensation at the time of contracting as opposed to, let us say, evidence that the amount was not a reasonable estimate of actual damages after the breach? Your Honor, I don't think there is a challenge in this case to Judge Koukouris' conclusion that sitting at the settlement table for dispute number one, this seemed like a reasonable number for an unspecified breach. It applied to any kind of breach, any disparagement, anything at all, which Texas takes as a caution. So really where we are is at the look back, the third step that Texas imposes, which is to measure the proportionality between the actual damages and the liquidated damages sought. So the biggest problem there really is that it was Keller's burden to show that that disparity was wrong, and there was not very much evidence in front of the court on that point. Let me see if I can provide some record sites that may help guide through an extensive transcript. Because when Keller Williams obtained, after the motions to compel, the financial documents and deposed the 30B6 witness, what we learned was the actual unrebutted sales figures that were untethered to Ms. Cottle's surmise that she had lost money in 2013. She had earned $2.7 million, which was $0.7 million more than she expected. Isn't that a gross figure, though? Yes, it is. And on the net revenues, which below the statements of fact described as the boldest misstatement of all, because she claimed a reduction from 2012 to 2013, but counted the million-dollar settlement payment as part of her net revenues for 2012. So if you take that out, her earnings actually went up in 2013 on a net basis. And as this court has probably noticed at pages 19 and 20 of the opening brief from the appellants, the increase in net expense that she's describing of having to pay agents more and losing agents came from the termination of her franchise. In her words from the, I think the word is the loss of the affiliation with the Keller Williams brand, which happened at the end of 2011. Go back for a second to Judge Rovner's question. If the agreement is sensible and defensible and so on when it's made, wouldn't there have to be some extraordinary subsequent event unanticipated by the parties that made the liquidated damages completely unreasonable? Wouldn't something have to have changed? No, Your Honor. There doesn't need to be a change except for if you have sophisticated parties, they make a reasonable agreement. Now, obviously, we've had these cases years ago. You can have a situation because of a natural disaster, wiping out, say, the defendant or the, it's just not possible to, it's not reasonable to try to enforce the agreement. But if nothing happens and you have sophisticated parties who negotiated it, why not just adhere to that? Texas doesn't require a force majeure standard. What they look at is what is the demand that has been made for the liquidated damages. And they use the test, is it unreasonably? So you're saying the liquidated damages clause was invalid ab initio? No, Your Honor, that it was invalid as applied. What rendered it invalid? It was rendered invalid as applied because the aggregate claim made against FPL was for $29.9 million when actual damages were only 6.1. And that wasn't anticipated when the contract was signed? Apparently not, Your Honor. It's not in the FPL record, nor is it anything that the court looked at in Texas. So they took this third-step look back, as Judge Koukouros did here, following exactly the reasoning of the Texas Supreme Court, and concluded that where there were no actual damages, where there was speculation as to lost referrals but no names, no records, not. . . You're saying there are no damages, zero damages? That's what the district court concluded, and that is what we found. Because, for example, plaintiff claimed that others thought less of her when, in fact, the evidence at Docket 120.1 was her own admission, in her own words, that she had an incredible reputation, ranks as one of the top agents in the country, sells more than $90 million in real estate. . . This is from her website? Yes, it is, exactly. So the allegations of damage are essentially mythical. They are speculative, as Judge Rovner pointed out in her questioning. There isn't even anecdotal evidence. There was one note that she had been asked to sell an interest in the Palo Alto franchise, but there was no evidence that she ever did sell it, what the price was. Was it a gain or a loss? None of this appeared. Well, I thought you also were making the point that she had to sell it anyway because of a conflict of interest related to the dispute that was resolved by the settlement, not because of anything else. If she's complying with that contract, yes. So the court did not abuse its discretion in looking at this record and concluding that there were neither logical nor actual damages, and certainly nothing approaching $20 million. What if the liquidated damages clause provided for $1 million in damages and, in fact, the actual damages were $250,000? Would that invalidate the liquidated damages clause? Texas might. They've invalidated clauses that are . . . That's great, so people really know what they're doing when they sign a liquidated damages clause. There is a case cited in our materials. I think it's the McGill case in which there was a real estate closing document and there was a penalty of returning three times the earnest money, and the court invalidated that as unreasonably disproportionate to any actual damages. So Judge Kokoris applied settled Texas law when he invalidated this liquidated damage provision, and he also had other reasons this court could affirm him, because the dissemination of already public information should not be a basis for cognizable damages, and the only disclosures here were of material that had already become public. There's one issue I just want to mention before I sit down, and that is I was surprised by some of the statements the plaintiffs made in the first three pages of the reply brief. I believe they accused us of misleading the court, playing fast and loose with the record, and engaging in a game of three-card Monty. I have practiced before this court for many years. I can assure the court that our citations were meticulous, including our citations to the December 4th conversation before the deal was signed where Settlement Counsel for Ms. Caudill and Settlement Counsel for Keller Williams had a conversation in which Ms. Caudill's counsel said, why do you need this anyway? You're just going to have to disclose it in your FDD, as in fact they did. We ask that the court affirm the ruling below. All right. Thank you very much. Anything further, Mr. Silverman? You said in your opening argument that you weren't asking for $20 million, but do you think you're entitled to $20 million? Yes. So why aren't you asking for it? We have not yet. This is mercy, is it? No, Your Honor. We have not yet asked for it. Not yet? But we intend to provide other alternative damage models for the court to consider. I thought you said you were not going to ask for $20 million. No, Judge. What I intended to say, I might have misspoken, but what I intended to say is we have not asked for $20 million. We have contended there's 2,000 disclosures. We believe it should be $20 million. But, Your Honor, just a couple of things on text calls. So are you asking for $20 million right now? Well, I don't know if it's the appropriate place to do it. That's a yes or no. We believe we're entitled to $20 million. In the case before the district court, we believe that it's not all or nothing. And the only way that we would lose the case is because of their – Do you think it's appropriate for the court to try to estimate the actual damages and compare that with the $20 million? I don't think it's reasonable, but I believe Texas law under certain circumstances requires it but not here because it's only required where actual damages can be shown. In the Helix case, it's right on point. There's no suggestion there that damages have not been or the actual damages are insufficient. That case is virtually the same factually. The only difference is we have multiple breaches, multiple occurrences, and that should not be a benefit to Keller Williams. The FPL case, the reason the liquidated damage provision was invalidated was because of the forecast. That was the reason. The forecast was if you breach, you have to pay the lesser of $50 per some unit or some figure, a market value determined by a body. The body never determined the market value. So the Texas Supreme Court said this is a flawed forecast. The issue has nothing to do – What if at a trial it turns out that the actual damages your client has suffered are only $1 million? Are you still being entitled to $20 million? Under Texas law, as controlling here, I believe the court would have a hard time with a 20 times multiple, but I don't believe that hypothetical is reality because the actual damages cannot be demonstrated here because of the reputational injury. Lost opportunities cannot be measured. As the parties agreed up front, they agreed, and all we want is that Keller Williams be bound to that. They agreed that these damages could not be measured. Then after the fact, they breach massively, and they say, you can't measure these. We say, we know we can't. It's your problem, not our problem. And they did not meet that burden. If you look at the Helix case, it's impossible to reconcile that case with what Judge Koukouros did,  Why can't they be measured? I don't understand. Pardon me, Judge? Why can't they be measured? To measure them, I believe you'd have to go to 2,000 people, and the people that they then communicated to or were encouraged to communicate to. No, you don't have to do that. You just interview, you know, depose a sample. You don't have to go to everybody. Well, it would be hard, Judge, because the real estate inherently is unique. You have commissions that vary per the property. So it's just inherent. This is a situation where it's as difficult as it can be to measure. That's why we have the provision, and everybody agreed. And they're in the real estate business, and they know that. The largest real estate company in North America is trying to get away from a contract. We just want to enforce the contract. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.